Louise VANN et al., Plaintiffs,

v.

**HOUSING AUTHORITY OF KANSAS CITY, MISSOURI et al., Defendants.**

No. 76–CV–0072–W–3.

United States District Court,
W. D. Missouri, W. D.

Aug. 12, 1980.

Julie Levin, Legal Aid, Kansas City, Mo., for plaintiffs.

Lloyd C. Loomis, George P. Coughlin, Gage & Tucker, Kansas City, Mo., for defendant Housing Authority.

Anthony Nugent, Asst. U. S. Atty., Kansas City, Mo., and Barrie L. Goldstein, Justice Dept., Washington, D. C., for defendant Dept. of HUD.

## ORDER

RUSSELL G. CLARK, District Judge.

Plaintiffs, Louise Vann, Pauline Smith, Anita Guerra and the Riverview Tenants Association filed a class action on February 5, 1976 challenging actions, policies and practices of the Housing Authority of Kansas City, Missouri and the Department of Housing & Urban Development which plaintiffs claim have caused and are causing racial impaction in public housing units in Kansas City, Missouri and which they allege have denied equal housing opportunities for families eligible for public housing. At the time the suit was filed plaintiffs Louise Vann,[1] Pauline Smith and Anita Guerra were residents of the Riverview Housing Project. The Riverview Tenants Association was an association of residents living within the Riverview Housing Project. In this action plaintiffs seek to address the alleged deprivation of their rights to equal protection and to fair housing opportunities pursuant to the 5th, 13th, and 14th amendments to the United States Constitution and 42 U.S.C. §§ 1981, 1982, 1983, 2000d and 3601 et seq.

---

1. Since the filing of this lawsuit, Louise Vann has moved from Riverview to private housing. Defendants contend that plaintiff Vann now lacks standing because of her voluntary transfer. Because of the Court's findings on the other issues, it finds that this issue need not be reached.

The plaintiffs' complaint challenges the action of HUD and the Housing Authority in the operation of two major housing programs for low income families: (1) conventional low income housing projects; and (2) the Section 8 Rental Program. With regard to the conventional housing projects, plaintiffs allege that the tenant assignment policies followed by the Housing Authority with the knowledge, consent and participation of HUD have resulted in racial segregation. Plaintiffs also maintain that defendants have failed to provide adequate funds for maintaining the environment in and around conventional developments. Likewise the actions of HUD in allegedly failing to authorize the construction of new units outside the inner city is challenged. Past decisions of HUD in selecting sites for present low income housing projects are also challenged as being arbitrary, discriminatory and a contributing factor to the racial impaction. Plaintiffs further claim that with regard to the Section 8 rental program the defendants have failed to establish procedural guidelines to limit the effect of the Section 8 program on neighborhoods which are racially impacted or which are experiencing racial turnover. HUD's approval of funds for the Section 8 existing program as opposed to the Section 8 new and substantial rehabilitation programs is also alleged to have compounded the racial impaction problem. HUD's decision to freeze all new housing starts for low income families and to rely instead on the Section 23 leasing program and subsequently the Section 8 Rental Program also is alleged to have contributed to racial segregation in Kansas City, Missouri.

Plaintiffs seek the following relief:

1. A temporary restraining order and preliminary injunction directing the Housing Authority to maintain through its tenant assignment policies the racial percentages by families presently in existence at Riverview and Guinotte Manor.

2. A temporary restraining order and preliminary injunction enjoining defendants from implementing the Section 8 existing housing program pending the outcome of the lawsuit.

3. A declaratory judgment that the policies, practices, acts, and failures to act of defendants complained of herein violate the Fifth, Thirteenth, and Fourteenth Amendments to the United States Constitution, Title VI of the Civil Rights Act of 1964, the Fair Housing Act of 1968, and 42 U.S.C. §§ 1981, 1982 and 1983.

4. A preliminary and permanent injunction which shall:

(a) enjoin defendants from the approval, use, and enforcement of the method of tenant assignment as set forth in plaintiffs' complaint;

(b) direct defendants to adopt affirmative policies to achieve racial integration in the developments managed by the Housing Authority, including a policy of racial occupancy controls which places a maximum limit on the number of families of each race which may be assigned to dwelling units in each development;

(c) enjoin all further funding by HUD to the Housing Authority pursuant to 42 U.S.C. § 2000d–1 until such time as the discriminatory housing practices complained of herein are discontinued;

(d) order defendant HUD to immediately assign program reservations and advertise the availability of contract authority under the Housing Act of 1937, 42 U.S.C. § 1437, et seq., to assist with the construction of conventional and Section 8 family units on behalf of plaintiffs and members of the class in well–planned neighborhoods outside the Kansas City School District, within the Kansas City Standard Metropolitan Statistical Area, sufficient in number to provide opportunities for plaintiffs and members of the class to reside in well–planned neighborhoods which are not impacted by low–income minorities;

(e) order defendant HUD to select a Public Housing Authority authorized to issue Metropolitan Certificates of Family Participation permitting plaintiffs and members of the class to rent appropriate units at any location within the Kansas City Standard Metropolitan Statistical Area;

(f) order defendant HUD to raise maximum permissible market rents in the Section 8 existing housing program to a level enabling plaintiffs and members of the class to acquire assisted housing in well–planned neighborhoods outside the Kansas City School District and within the Kansas City Standard Metropolitan Statistical Area;

(g) order defendant HUD in its execution of Federal duties under the Fair Housing Act of 1968 to establish realistic standards determining maximum valuation of site acquisition costs permitting the location and development of housing assisted under Section 8 for use by families in desirable suburban and urban settings outside the Kansas City School District and within the Kansas City Standard Metropolitan Statistical Area.

On April 21, 1976 plaintiffs moved for a preliminary injunction to avoid further racial impaction in existing low rent housing developments and to enjoin further implementation of the Section 8 existing housing project. Additional suggestions have been filed in support and in opposition to this motion. Plaintiffs have also requested the Court to certify a class composed of "all persons who now reside or who are eligible to reside in dwelling units managed by the housing authority" (Sugg. submitted July 13, 1976).

On August 16, 1976 the federal defendants filed their opposition to the plaintiffs' motion for a preliminary injunction. Additionally the federal defendants moved to dismiss plaintiffs' complaint or alternatively for summary judgment on the grounds that plaintiffs do not have standing to sue or alternatively that there are no material issues in dispute. Simultaneously the federal defendants suggested that plaintiffs' motion for class certification should be held in abeyance until the Court has considered the defendants' motion to dismiss.

The motion to dismiss and opposition thereto raised the issue of plaintiffs' standing to maintain this action. Therefore, on December 20, 1976 Judge William Becker ordered plaintiffs to file a narrative statement of facts relied upon to establish standing and to support the issuance of a preliminary injunction. The plaintiffs were also directed to submit a proposed preliminary injunction including findings of fact and conclusions of law. The defendants were given an opportunity to respond to these pleadings. Subsequent to the filing of the individual statement of narrative facts, the parties submitted a joint narrative statement of facts, which by its terms was intended to supersede the previously individually submitted narrative statements and responses thereto. Plaintiffs and defendants subsequently each filed a proposed order on the standing and preliminary injunction issues. The defendants have also filed a narrative statement of disputed facts. After a conference on July 31, 1979, the parties were allowed additional time in which to update case authority on the jurisdictional issue. Before considering plaintiffs' motion for a preliminary injunction, the Court must first consider the preliminary issues raised by the defendants' motion to dismiss.

## STANDING

The defendants have disputed plaintiffs' standing to maintain this lawsuit and claim that the named plaintiffs have suffered no injury in fact. Because plaintiffs' complaint challenges the operational and administrative policies of a number of different housing programs the standing issue must be analyzed with regard to each program which plaintiffs claim have been operated in a discriminatory fashion.

## SECTION 8 RENTAL PROGRAM

Plaintiffs' complaint contains the following averments concerning the Section 8 rental program:

45. Defendants have recently entered into an agreement under the Section 8 Existing Housing Program established by Congress in 1974 whereby the Housing Authority will provide housing to 635 families in private dwelling units located within Kansas City, Missouri. This program, authorized under 42 U.S.C. § 1437f, is designed to replace the Section 23 Pro-

gram. Eligible families will receive a Certificate of Family Participation which will enable them to lease rental units of their own choosing so long as the market rents fall within prescribed limits. These families will receive a housing assistance payment to lower their rental expense.

46. Defendants have approved guidelines whereby current residents in conventional public housing developments such as plaintiffs Vann, Smith, and Guerra are eligible to transfer into the Section 8 program.

47. Defendant HUD has limited the Housing Authority's implementation of the Section 8 Program to existing units although authorized by statute to provide assistance payments for newly constructed and substantially rehabilitated housing. Furthermore, HUD has severely limited the market rents which participant families will be permitted to pay and has thus restricted these families to dwelling units which are older and located in declining areas.

48. A family assisted under the Section 8 Program has very little geographic mobility because the Secretary has failed to provide a procedure by which a participant family might select housing at any location in the metropolitan area. A family must locate housing within the geographical boundaries of the public housing agency.

49. In addition, families occupying approved units may not move to other units within that geographical area without first obtaining a new Certificate which may be unobtainable if sufficient contract authority is no longer available to the public housing agency. 24 C.F.R. § 1275. 207(g).

50. Defendants have failed and refused to establish procedures or guidelines to limit the impact of the Section 8 Program on neighborhoods which are racially impacted or experiencing racial turnover, nor have they taken any affirmative actions in the Section 8 Program to affirmatively promote housing opportunities for participant families in open, integrated neighborhoods.

51. As a direct result of the limitations limitations placed upon the Section 8 Program and the failure of defendants to affirmatively promote integrated housing patterns, described above in Paragraphs 45 through 50, implementation of said program will result in placement of plaintiffs in racially–impacted or transitional neighborhoods and thereby deny plaintiffs their right to open housing.

Paragraphs 213 through 267 of the joint stipulation of narrative facts relate to the operation of the Section 8 Rental Program. These stipulated facts indicate:

1. The Kansas City, Kansas Area Office decided to use its available Section 8 contract authority by first soliciting applications from PHAs within its jurisdiction for Section 8 Existing Housing Programs.

2. This solicitation of applications for Section 8 Existing Housing occurred in February, 1975.

3. The remainder of the contract authority of the Kansas City, Kansas Area Office was then advertised for proposals for Section 8 New Construction and Substantial Rehabilitation Programs.

4. The Kansas City Area Office provided notification of fundability to all local housing authorities within the KC SMSA. In addition, the notification and invitation for proposals were sent to the Governors of both states, the county executives, real estate boards, regional planning commissions, county and minority newspapers, minority interest groups, both municipal leagues, Mayors of cities with approved housing assistance plans, and all individuals who had requested placement on the Section 8 mailing list.

5. In early 1975, HAKC submitted an application to HUD for contract authority for approximately 635 units of existing housing assistance in a Section 8 Program. That application was approved.

6. Under HAKC's Section 8 Program, eligible tenants select a rental unit in the private market within the corporate limits of Kansas City, Missouri, which rental unit

must meet minimum standards of habitability and must rent for an amount at or less than certain Fair Market Rents established by HUD.

7. The phasing in of 70 units from HAKC's Section 23 Program resulted in a total of 705 available rental units during the first year of the Section 8 Program.

8. Current tenants in HAKC's seven family housing projects are eligible to participate in HAKC's Section 8 Existing Housing Program.

9. At the present time, approximately 75 percent of all tenants under lease in HAKC's Section 8 Program were qualified as "in place" tenants.

10. The Existing Housing Programs now authorized in the KC SMSA as of April 1, 1977, were as follows: Kansas City, Missouri; Bonner Springs, Kansas; Weston, Missouri; Olathe, Kansas; Excelsior Springs, Missouri; Independence, Missouri; and Lee's Summit, Missouri.

11. Of the 1,240 units of Existing Section 8 Housing provided by the Secretary in the KC SMSA as a result of the first field allocation, 615 or 49.5% are outside of the City, and 81% are designated for family occupancy.

12. Residents of Kansas City, Missouri have applied and received Certificates from the Independence Housing Authority (IHA). The race, family classification and address of each former resident of Kansas City are shown in Exhibit 58.

13. Residents of Kansas City, Missouri have applied and received Certificates from the Excelsior Springs Housing Authority (ESHA). The race, family classification and address of each former resident of Kansas City are shown in Exhibit 59.

14. Residents of Kansas City, Missouri have applied and received Certificates from the Richmond Housing Authority (RHA). The race, family classification and address of each former resident of Kansas City are shown in Exhibit 60.

15. Residents of Kansas City, Missouri have applied and received Certificates from the Olathe Housing Authority (OHA). The race, family classification and address of each former resident of Kansas City are as shown in Exhibit 61.

16. Residents of Kansas City, Missouri have applied and received Certificates from the Lee's Summit Housing Authority (LSHA). The race, family classification and address of each former resident of Kansas City are as shown in Exhibit 62.

17. As of March 15, 1977, the above PHAs had issued in excess of 2,700 Section 8 Certificates of Family Participation.

18. The Fair Market Rents (FMR) for Section 8 Existing Housing for the KC SMSA as of May 28, 1976, were as follows:

| Type of Unit | Non-Elevator | Elevator |
| --- | --- | --- |
| 0 Bedroom | $130.00 | $143.00 |
| 1 Bedroom | $148.00 | $163.00 |
| 2 Bedrooms | $176.00 | $193.00 |
| 3 Bedrooms | $203.00 | $224.00 |
| 4 Bedrooms | $231.00 | $254.00 |

19. There has been no new construction of units for families under Section 8 in the KC SMSA.

20. There has been no substantial rehabilitation of units for families under Section 8 in the KC SMSA.

21. One Section 8 rehabilitation proposal is now being processed by the Kansas City, Kansas Area Office.

22. Under this proposal, the Housing Development Corporation and Information Center would own and rent 80 units as authorized under the USHA.

23. A proposal of HAKC for substantial rehabilitation of scattered site units under the conventional low–rent housing program has been approved by HUD. The location of these units is set forth in Exhibit 63.

24. A proposal of the HDCIC for the substantial rehabilitation of 52 units at scattered sites has been approved by HUD. The location of these scattered sites is set out in Exhibit 64.

25. A second proposal of HDCIC for additional units at scattered sites within Kansas City to be rehabilitated under Section 8 has been approved by HUD. The location of these scattered sites is set out in Exhibit 65.

26. One Section 8 new construction proposal for the construction of eight non–elderly units has been approved by HUD's Area Office. These eight units will be located in Buckner, Missouri.

27. The Section 8 Set–Aside Program currently authorizes the assistance of 1,393 units.

28. The parties have also stipulated that none of the individual plaintiffs have ever sought admission to the Section 8 Existing Housing Program.

■ For the purpose of a motion to dismiss for want of standing the trial court must accept as true all material allegations of the complaint; however, the court may allow the plaintiff to supply additional facts supportive of plaintiff's standing by amendment to the complaint or by affidavit. *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Thus in considering the standing issue the Court will rely on the allegations of plaintiffs' complaint and the joint narrative stipulation of facts filed August 2, 1977.

Under Title 2 of the Housing and Community Development Act of 1974, the principal source of housing assistance for low income individuals is the Section 8 Rental Program. Three Section 8 programs exist: new construction, substantial rehabilitation, and existing housing. 42 U.S.C. § 1437f(b)(2) authorizes the Secretary to make assistance payments pursuant to contract with owners or prospective owners who agree to build or rehabilitate housing where some units will be available for occupancy by low income families. 42 U.S.C. § 1437f(b)(1) authorizes the Secretary or public housing agencies to make contracts for assistance payments to owners of existing dwellings. After a fair market rental for each unit is established, the Housing Authority or HUD is authorized to enter a contract with the owners of dwellings for a payment constituting the difference between the rent payable by the family and the fair market rent. A family eligible for participation in the Section 8 program is given a certificate of family participation which allows the family to seek suitable housing anywhere within the Housing Authority's jurisdiction. (See 42 U.S.C. § 1437f and suggestions of law in support of the federal defendants' opposition to plaintiffs' motion for preliminary injunction pp. 4–7.)

■ Based on the above facts as set forth in the complaint and agreed to in the joint stipulation of narrative facts, the Court finds that plaintiffs Vann, Guerra, Smith and the Riverview Tenants Association have no standing to challenge the operation of the Section 8 Rental Program. In essence standing determines whether a litigant is entitled to have the Court decide the merits of a dispute or a particular issue. In both its constitutional and prudential aspects, standing is concerned with the proper role of the Court in a democratic society. *Warth v. Seldin*, 422 U.S. at 490, 95 S.Ct. 2197, 45 L.Ed.2d 343.

■ Article III of the Constitution extends the Court's judicial power only to cases or controversies. In its constitutional dimensions, standing requires a party seeking to invoke the Court's jurisdiction to allege a personal stake in the outcome of the controversy. This requirement assures the concrete adverseness which is necessary to sharpen the presentation of relevant issues. *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663, 678 (1962). As reformulated in subsequent cases, the requirement of a personal stake in the outcome of a case requires not only a distinct and palpable injury, but also a traceable causal connection between the claimed injury and the challenged conduct. *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). In short, to satisfy Article III plaintiffs must show that they personally have suffered some actual or threatened injury resulting from the defendants' putative illegal conduct. *Gladstone Realtors v. Bellwood*, 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66, 76 (1979); *Warth v. Seldin*, 422 U.S. at 497–500, 95 S.Ct. at 2204–2206, 45 L.Ed.2d at 354–55; *Linda R. S. v. Richard D.*, 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973).

The first requirement of the two pronged test for establishing constitutional standing is the allegation of a distinct and palpable injury. Plaintiffs must show "real and immediate injury" affecting them individually. *Rizzo v. Goode*, 423 U.S. 362, 372, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976). In this case, plaintiffs' complaint is supplemented by a proposed order determining findings of fact and conclusions of law as to plaintiffs' standing filed August 31, 1979. In this proposed order, plaintiffs allege the following injury:

1. Plaintiffs Vann, Guerra and Smith have shown by their residence at Riverview that they have been injured and will continue to be injured from the denial of social amenities characteristically found in an integrated neighborhood.

2. Plaintiffs Vann, Guerra and Smith have shown that they have been injured and will continue to be injured due to their inability to rent housing outside the "inner-city" area.

3. Plaintiffs Vann, Guerra and Smith have shown by their residence at Riverview that they have been injured and will continue to be injured from the denial of employment opportunities characteristically found in an integrated community.

4. Plaintiffs Vann, Guerra and Smith have shown by their residence at Riverview that they have been injured and will continue to be injured from the denial of economic opportunities characteristically found in an integrated neighborhood.

5. Plaintiffs Vann, Guerra and Smith have shown by their residence at Riverview that they have suffered injury to, and will continue to suffer injury to, their reputations because of the undesirable stigma associated with living in the "inner city".

6. Plaintiffs Vann and Guerra have shown by their residence at Riverview that they have suffered injury, and will continue to suffer injury, resulting from the denial of educational opportunities to their children.

The Supreme Court has recognized that economic injury is not the only injury that will support standing. See, e. g., *Arlington Heights v. Metro Housing Corporation*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). In *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972), tenants of a large apartment complex in San Francisco complained that the owner's discrimination against non–white rental applicants injured them in that they had lost the social and professional benefits of living in an integrated community. The Court, in holding that the plaintiffs had demonstrated standing to sue, relied in large part on its interpretation of 42 U.S.C. § 3610(a). However, while Congress may statutorily relieve parties of prudential limitations on standing, the Article III requirement remains. Therefore the Court must have concluded that these allegations satisfied the Article III case or controversy requirement. *Warth v. Seldin*, 422 U.S. at 501, 95 S.Ct. at 2206, 45 L.Ed.2d at 356. In *Gladstone Realtors v. Bellwood*, 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979), individual respondents claimed standing as community homeowners injured by the challenged steering activities. The Court carefully considered whether an allegation that the area was losing its integrated character as a result of the petitioner's conduct was sufficient to satisfy Article III:

The constitutional limits of respondents' standing to protest the intentional segregation of their community do not vary simply because that community is defined in terms of city blocks rather than apartment buildings. Rather, they are determined by the presence or absence of a "distinct and palpable injury," *Warth v. Seldin*, 422 U.S., at 501, 95 S.Ct. 2197, at 2206, 45 L.Ed.2d 343, to respondents resulting from petitioners' conduct. A "neighborhood" whose racial composition allegedly is being manipulated may be so extensive in area, so heavily or even so sparsely populated, or so lacking in shared social and commercial intercourse that there would be no actual injury to a particular resident. The presence of a genuine injury should be ascertainable on

the basis of discrete facts presented at trial. *Gladstone Realtors v. Bellwood*, at 114, 99 S.Ct. at 1615, 60 L.Ed.2d at 85–86.

The racial impaction claimed by residents of the Riverview Housing Project to have resulted in Kansas City, Missouri as a result of the Section 8 housing program is far more generalized complaint than the claims of the plaintiffs in *Gladstone Realtors v. Bellwood* or *Trafficante v. Metropolitan Life Ins. Co.* The Court questions whether the generalized grievances of these plaintiffs concerning the effect of the Section 8 Rental Program on the community in general is the type of distinct individualized grievance required by Article III. Further, Article III judicial power exists only to redress and prevent *injuries to the complaining party.* The distinct injuries resulting from the rental policies attacked here would be suffered primarily by those associated with the rental program. The named plaintiffs in this action have not been associated with the Section 8 program, have not applied to participate in the program and expressed no desire to be affiliated with it in any manner. Thus the Court finds that plaintiffs have not sustained "distinct and palpable injuries" from the operation of these programs sufficient to warrant the exercise of the Court's remedial powers on *their* behalf.

The second prong of the standing requirement requires a petitioner to demonstrate through his allegations a causal connection between the alleged injury and the challenged action of the defendants. In this case it appears doubtful that the injuries alleged by plaintiff, primarily those disadvantages arising from racial impaction and living in a segregated community, can be causally related to the Section 8 Rental Program. The Secretary provided 1,240 rental units under the existing Section 8 housing program in 1977. Almost half of these units—49.5%—were located outside the city in which plaintiffs claim the racial impaction occurred. (Joint narrative statement of stipulated facts, August 2, 1977, No. 247). Even assuming that all remaining rental units were located within the racially impacted area of Kansas City, the number of units involved appears inadequate to produce the type of racial impaction alleged. Even assuming the Court could fashion some remedy requiring the relocation of these units, it is doubtful if such action would relieve the plaintiffs of their alleged injury. The Supreme Court has indicated that unadorned speculation concerning a Court's remedial power will not support a claim to standing. *Linda R. S. v. Richard D.*, 410 U.S. at 614, 93 S.Ct. at 1146, 35 L.Ed.2d at 536 and *Simon v. Kentucky Welfare Organization*, 426 U.S. at 26, 96 S.Ct. at 1917, 48 L.Ed.2d at 450. As the Court explained in *Simon v. Eastern Kentucky Welfare Rights Organization*:

> The principle of *Linda R. S.* and *Warth* controls this case. As stated in *Warth*, that principle is that indirectness of injury, while not necessarily fatal to standing, "may make it substantially more difficult to meet the minimum requirement of Art. III: to establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm." 422 U.S., at 505, 95 S.Ct. 2197, at 2208, 45 L.Ed.2d 343. Respondents have failed to carry this burden. Speculative inferences are necessary to connect their injury to the challenged actions of petitioners. Moreover, the complaint suggests no substantial likelihood that victory in this suit would result in respondents' receiving the hospital treatment they desire. *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 44–46, 96 S.Ct. 1917, 1927–28, 48 L.Ed.2d 450 (1976).

In this case the alleged injuries are only indirectly related to the challenged actions regarding the Section 8 rental program. Like the Supreme Court in *Simon*, this Court does not believe that plaintiffs have met the burden of connecting their injuries to actions taken in conjunction with the Section 8 rental program. In addition, the complaint suggests no likelihood that changes in the Section 8 rental program would alleviate the injuries which plaintiffs claim to have suffered from residing in a racially segregated neighborhood. Thus,

the Court finds that the individual plaintiffs have not met the constitutional standing requirement to challenge the Section 8 rental program.

 Even if the plaintiffs were found to have Article III standing, prudential restrictions on standing limit the class of persons who may invoke the Court's decisional and remedial powers and preclude plaintiffs from challenging this rental program. When the asserted harm is a generalized grievance shared in substantially equal measures by all or a large class of citizens, that harm alone does not warrant the exercise of the Court's jurisdiction. *Warth*, 422 U.S. at 499, 95 S.Ct. at 2205, 45 L.Ed.2d at 355. See also *Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974). Additionally, courts have held that even plaintiffs who allege injury sufficient to meet the case or controversy requirement must nevertheless assert individual legal rights and interests and cannot rest a claim to relief on the legal rights or interests of third parties. *Tileston v. Ullman*, 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943); *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343. Thus, plaintiffs may not bring suit merely to vindicate the rights of individuals who are participants in the Section 8 program, but not parties to this lawsuit. On either of these bases, therefore, prudential restrictions on standing preclude plaintiffs from challenging the Section 8 rental program.

█ The Riverview Tenants Association (RTA) has alleged no personal injury resulting from the challenged action taken in connection with the Section 8 rental program and no basis exists on which the Court could find such an injury. Since the RTA has alleged no personal injury, the organization can claim standing only as a representative of its members who have been injured in fact. *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. at 40, 96 S.Ct. at 1925, 48 L.Ed.2d at 461. Since plaintiffs Vann, Guerra and Smith lack individual standing as determined above, the Riverview Tenants Association lacks standing to sue on their behalf. For all of these reasons, the defendants' motion to dismiss in connection with plaintiffs' claim concerning the Section 8 Rental Program will be granted.

Plaintiffs' complaint also refers to the Section 23 leased housing program. Under the Section 23 program, HAKC leased rental units from private owners and in turn subleased those units to eligible tenants. Consequently all of the reasons advanced by the Court for denying the plaintiffs standing to challenge the Section 8 rental program apply equally to the Section 23 leasing program. Moreover, as of the filing of the joint stipulation in August of 1977, the scheduled Section 23 program was to merge with the Section 8 program over a three year period. The Court therefore believes that any claims originally asserted in connection with the Section 23 program should be handled as part of the Section 8 rental program. Accordingly, these claims will be dismissed for the reasons outlined above.

## CONVENTIONAL HOUSING PROJECTS

With regard to conventional housing projects, plaintiffs challenge the tenant assignment policies used in the placement of applicants as well as various administrative decisions concerning the direction of the conventional housing program in Kansas City.

### Tenant Assignment Program

The Housing Authority of Kansas City (HAKC), a public housing agency as defined in 42 U.S.C. § 1437a(6), is engaged in the operation of federally assisted low rent housing programs. HAKC presently has 13 housing projects under its management. Seven of these units are for family occupancy and contain a total of 2,312 units. Plaintiffs' complaint sets forth the following allegations concerning tenant assignment policies in connection with these seven housing projects:

30. At all times prior to January of 1973, the Housing Authority followed a tenant selection policy under which two of these developments, Riverview and Guinotte Manor, were exclusively re-

served for use by white families. The remaining five developments, Wayne Miner Court, T. B. Watkins Homes, Chouteau Court, West Bluff, and Pennway Plaza, were openly maintained as providing low–rent housing primarily for non–white families.

31. Efforts were made by the Housing Authority to steer applicants of one race away from developments occupied by tenants of another race. This operational policy was designed to perpetuate separation of the races in the housing facilities owned and operated by the Housing Authority.

32. Beginning in 1973, the Housing Authority attempted to racially integrate Guinotte Minor and Riverview which by that time were located within a blighted neighborhood, were in need of maintenance, and were generally as a result thereof experiencing rapid turnover of tenants who had resided therein for ten years and longer. The assignment of large numbers of non–white families to these two developments created a racial tipping effect which resulted in the flight of many white families and an increase in vacancy rates. Over a period of time, the racial balance in both projects continued to shift with increasing numbers of black families replacing white families.

33. During this same period, the Housing Authority made no similar effort to place white families in the five developments tenanted primarily by non–whites.

34. The Housing Authority's inability to construct new units, the location of existing family units, and its failure to enact an affirmative assignment policy designed to promote integration of its existing developments all directly contributed to racial impaction of minorities in the seven conventional developments.

35. On August 1, 1974, the racial mix in the seven conventional public housing developments was as follows:

Chouteau Court (140 units), 95% Black, 5% White; T. B. Watkins Homes (348 units), 100% Black; Guinotte Manor (454 units), 40% Black, 60% White;

Wayne Miner Court (690 units), 99% Black, 1% White; Riverview (232 units), 20% Black, 80% White; West Bluff (100 units), 34% Black, 12% White, 54% Mexican–American; Pennway Plaza (250 units), 73% Black, 18% White, 9% Mexican–American.

36. By August 1, 1975, the racial mix in conventional public housing designed for families was as follows:

Chouteau Court, 95% Black, 5% White; T. B. Watkins Homes, 100% Black; Guinotte Manor, 53% Black, 47% White; Wayne Miner Court, 99% Black, 1% White; Riverview, 54% Black, 46% White; West Bluff, 38% Black, 11% White, 51% Mexican–American; Pennway Plaza, 78% Black, 15% White, 7% Mexican–American.

37. At all relevant times, the Housing Authority followed and continues to follow tenant assignment policies which have had the effect of promoting racial segregation in the Authority's public housing developments. New applicants have been permitted to select the developments in which they desire to be placed, and a separate waiting list is maintained for each development. This has effectively guaranteed that no white families will be placed in developments occupied primarily or exclusively by black families.

38. Furthermore, the Housing Authority has taken no account of the resultant racial make–up in the seven family developments, by way of either attempting to adjust the percentages in the five non–white developments or placing controls on the tipping phenomenon occurring at Riverview and Guinotte Manor.

39. The above–described actions of the Housing Authority were taken with the full knowledge, consent, and participation of HUD in that HUD approved site locations for all developments built by the Authority and provided funds for the construction of the developments. HUD further monitored the tenant assignment practices of the Housing Au-

thority through monthly reporting procedures and conducted periodic management reviews which revealed what was readily apparent to even the casual observer: the Housing Authority was operating a segregated public housing system and following policies which would make it permanently segregated.

65. HUD has failed and refused to take any affirmative action to change the tenant assignment practices of the Housing Authority, or to conduct studies, make recommendations and consult with local officials to formulate and effect an affirmative plan to reduce and reverse the increasing acceleration of racial impaction of minorities within dwelling units owned, managed, operated, and leased by the Housing Authority within the inner–city of the City of Kansas City, Missouri, in violation of the Fair Housing Act of 1968.

69. The use by the Housing Authority and approval by HUD of a tenant assignment plan which permits new tenants to select the apartment developments in which they desire to be placed and which fails at the same time to place controls on the resultant racial make–up in those developments, has deprived plaintiffs and the class they represent of their right to live in a truly integrated and balanced public housing neighborhood, as guaranteed to them by the Fair Housing Act of 1968, 42 U.S.C. § 3601, et seq., and the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

70. The failure of defendants to establish a tenant assignment plan which will have the affirmative effect of causing racial integration in Wayne Miner Court, T. B. Watkins Homes, Chouteau Court, West Bluff, and Pennway Plaza, and which will have the further effect of preventing racial resegregation at Riverview and Guinotte Manor has violated the affirmative duty imposed on defendants by the Fair Housing Act of 1968, 42 U.S.C. § 3601, et seq., to create open, integrated residential housing patterns and to prevent the increase of racial segregation.

Consequently, plaintiffs have requested the Court to issue a preliminary injunction directing the Housing Authority to maintain the racial percentage in existence at Riverview and Guinotte Manor pending the outcome of this suit. Further, plaintiffs request permanent injunctive relief (1) enjoining defendants from implementing the tenant assignment procedures described in Paragraphs 29 through 36 of the complaint; and (2) directing the defendants to adopt affirmative policies to achieve racial integration including the establishment of racial quotas for each apartment complex.

In connection with the preliminary issues raised by plaintiffs' challenge to the tenant assignment policies of HUD and HAKC, the parties have stipulated the following facts:

*Racial Composition of Public Housing Projects*

160. Riverview (Mo. 2–5) is located at 299 Paseo and was the first project to be completed by HAKC. It is located in Census Tract No. 10. It contains 232 units for family occupancy and its date of full availability (DFA), i. e., substantial completion, was 1952. As of February, 1977, the project was 88% occupied with 30% white and 70% non–white tenants (67% Black, 2% Spanish American and 1% other).

161. T. B. Watkins (Mo. 2–2) is located at 1336 Highland and contains 348 units for family occupancy. It is located in Census Tract No. 16. Its DFA was 1954. As of February, 1977, the project was 77% occupied with 0% white and 100% non–white tenants (100% Black, 0% Spanish American and 0% other).

162. Guinotte Manor (Mo. 2–3) is located at 110 East Fourth and contains 454 units for family occupancy. It is located in Census Tract No. 3 and its DFA was 1954. As of February, 1977, the project was 69% occupied with 34% white and 66% non–white tenants (46% Black, 1% Spanish American and 19% other).

163. Pennway (Mo. 2–10) is located at 1915 Holly and contains 250 units for family occupancy. It is located in Census Tract No. 30 and its DFA was 1959. As of February, 1977, the project was 61% occupied with 14% white and 86% non–white tenants (82% Black, 3% Spanish American and 1% other).

164. Chouteau Courts (Mo. 2–1) is located at 1220 Independence and contains 140 units for family occupancy. It is located in Census Tract No. 15 and its DFA was 1959. As of February, 1977, the project was 66% occupied with 2% white and 98% non–white tenants (98% Black, 0% Spanish American and 0% other).

165. Wayne Minor (Mo. 2–4) is located at 1940 East 11th and contains 738 units for family occupancy. It is located in Census Tract No. 17 and its DFA was 1961. As of February, 1977, the project was 54% occupied with 2% white and 98% non–white tenants (98% Black, 0% Spanish and 0% other).

166. West Bluff (Mo. 2–8) is located at 1210 West Bluff and contains 100 units for family occupancy. It is located in Census Tract No. 30 and its DFA was 1963. As of February, 1977, the project was 89% occupied with 8% white and 92% non–white tenants (51% Black, 41% Spanish American and 0% other).

167. As of February, 1977, these seven projects had a total of 1554 units occupied and their total racial occupancy was 13% white and 87% non–white (79% Black, 3% Spanish American and 4% other).

172. No new public housing developments for families have been constructed in Kansas City, Missouri, since 1963.

183. The racial composition of all applicants seeking admission to and finding placement in the above seven family developments during 1975 was 85% non–white and 15% white.

184. The racial composition of all applicants seeking admission to and finding placement in the above seven family developments during 1976 was 91% non–white and 9% white.

195. Non–white and white applicants were placed in Chouteau in 1971, 1972, 1973, 1974, 1975 and 1976.

196. Non–white and white applicants were placed in Wayne Minor in 1971, 1972, 1973, 1974, 1975 and 1976.

197. Non–white and white applicants were placed in Guinotte Manor in 1971, 1972, 1973, 1974, 1975, and 1976.

198. Non–white and white applicants were placed at Riverview in 1971, 1972, 1973, 1974, 1975, and 1976.

199. Non–white and white applicants were placed at West Bluff in 1971, 1972, 1973, 1974, 1975, and 1976.

200. Non–white and white applicants were placed at Pennway Plaza in 1971, 1972, 1973, 1974, 1975, and 1976.

201. No white applicants were placed at T. B. Watkins during the years 1970, 1971, 1972, 1973, 1974 and 1975.

202. White applicants were placed at T. B. Watkins during the years 1967, 1968, 1969 and 1976.

*Past Methods of Assignment (MOA)*

375. Exhibit 134 is Section 102.1, "Racial Policy", of HUD's Low Rent Housing Manual, dated February 21, 1951.

376. In May, 1963, Section 102.1 was amended by HUD in response to Section 101 of Executive Order 11063. It stated that the Local Authority shall not discriminate because of race, color, creed or national origin. See Exhibit 135.

377. In May, 1965, Section 102.1 was amended by HUD in response to Title VI of the Civil Rights Act of 1964. It referred to a circular dated December 30, 1964, in which local authorities were requested to submit a statement on their policies and practices for tenant selection and assignment in accord with Title VI. Exhibit 136 is a copy of that circular entitled Civil Rights Act of 1964, P.L. 88–352, July 2, 1964, 78 Stat. 241.

378. In November of 1965, Section 102.1 was amended pursuant to an August 27, 1975 Circular providing that local authorities must adopt specific methods of administration. See Exhibit 137.

379. HUD regulations issued in response to Title VI of the Civil Rights Act of 1964 for tenant selection and assignment in the public housing program are found at 24 C.F.R. 1.4(b)(2)(ii) and (iii). See Exhibit 138.

380. These provisions on Methods of Administration for Tenant Selection and Assignment (MOA) referred to above are now contained in HUD Handbook 7401.1, Low–Rent Housing Administration of Program Handbook, Chapter 9, Section 1, Appendix 2. See Exhibit 139.

381. Applicants who are found eligible are placed on a waiting list and are subsequently referred to a particular housing project by application of HAKC's MOA.

382. The MOA followed by HAKC from the inception of the seven family projects until September, 1967 generally allowed applicants to select the project in which they preferred to be placed.

383. The MOA established in 1967 by HUD by the issuance of regulations was designed to assign eligible applicants to dwelling units based upon a plan adopted by the local housing authority and approved by the Director of Housing Management for the responsible HUD area office.

384. The MOA required tenant assignment on a community–wide basis in sequence based upon date of application, size or type of suitable unit and preference factors established by the housing agency.

385. HAKC was free to choose between two tenant assignment plans:

(a) Plan A: This required that an applicant accept the unit offered or be moved to the last place on the waiting list;

(b) Plan B: This required that an applicant be offered a unit at the location containing the largest number of vacancies; if the applicant rejects the first vacancy he is offered a unit at the location with the next highest number of vacancies; if the applicant rejects three such offers without good cause he is placed on the bottom of the waiting list.

386. On September 8, 1967, HAKC enacted Plan B as its Tenant Assignment Policy by Board Resolution No. 1514. A copy of that Board Resolution is set forth as Exhibit 140.

387. Under Plan B, applicants were placed on a single waiting list in chronological order.

388. In late 1972, shortly after he became Executive Director of HAKC, defendant Bridges followed a tenant assignment practice, hereinafter referred to as "freedom of choice" practice, whereby applicants expressed their preference as to the project in which they desired to be placed and their names were placed on waiting lists which were maintained separately for each project.

389. The "freedom of choice" tenant assignment practice was never presented to and approved by the Board of Commissioners of HAKC by board resolution. Beginning in 1975 numerous amendments to the tenant assignment policies were proposed but never approved. See joint stipulation, paragraphs 390–415.

*Current Methods of Assignment*

417. The current MOA of HAKC, as approved by HUD on March 28, 1977, and as modified with the approval of HUD on May 26, 1977, is set forth as Exhibit 163.

418. The current MOA of HAKC became operational on July 1, 1977.

Under the modified method of assignment, applicants for public housing are assigned to units on a "first come first served" basis in accordance with the date and time of their application. In addition, an affirmative tenant assignment plan was included in this May 26, 1977 modification. The affirmative tenant assignment plan encompasses both a minority preference option and an immediate housing option. The minority preference option allows an applicant to receive a preference in assignment to any project in which that person's race represents less than one–third of the resident population of the project. An applicant who does not exercise this preference remains on the waiting list until his name

comes to the top. Also included in this affirmative action plan is an immediate housing option permitting applicants to choose immediate housing at any of three locations with the highest percentage of vacancies. Adopted in response to the growing number of unfilled vacancies at several locations, this option is available only for those vacant units which do not meet the needs of applicants already on the housing waiting list. The plan additionally provided for notifying individuals then on the waiting list of these modifications as well as notifying present tenants, prospective tenants and the community at large.

Plaintiffs maintain that between 1972 and 1976 HUD and HAKC followed Plan B (24 C.F.R. 1.4(B)(2)(ii)) irregularly and, in fact, followed a "freedom of choice" policy under which applicants were theoretically assigned to whatever developments they preferred. Plaintiffs maintain that these tenant assignment policies resulted in racially identifiable project sites, and that HAKC has taken no affirmative action to overcome the effects of these policies. Plaintiffs claim further that assignment of tenants according to the date of application with provisions for a minority preference and immediate housing options will not promote fair housing opportunities and cannot alleviate existing racial segregation or prevent future racial segregation. The defendants however maintain that plaintiffs have shown no injury resulting from the challenged tenant assignment policies, and that the adoption of an affirmative tenant assignment plan since the commencement of this lawsuit has rendered plaintiffs' claims moot.

The mootness doctrine arises from the Article III case or controversy requirement. As the Supreme Court explained this doctrine:

Early in its history, this Court held that it had no power to issue advisory opinions, and it has frequently repeated that federal courts are without power to decide questions that cannot affect the rights of litigants in the case before them. To be cognizable in a federal court, a suit "must be definite and concrete, touching the legal relations of parties having adverse legal interests. . . . It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." Mootness is a jurisdictional question because the Court "is not empowered to decide moot questions or abstract propositions," [citations omitted] *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413, 415–16 (1971).

The Court on numerous occasions has reiterated that, in general, a voluntary cessation of allegedly illegal conduct does not deprive the tribunal of the power to hear and determine a case. *DeFunis v. Odegaard*, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974); *United States v. W. T. Grant Co.*, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). Despite these considerations, the Supreme Court recently has articulated the following test and held that the Court's jurisdiction, although properly acquired, may abate if the case becomes most because:

(1) it can be said with assurance that "there is no reasonable expectation . . ." that the alleged violation will recur, see id., at 633, 73 S.Ct. 894 [, at 897], 97 L.Ed. 1303 see also *SEC v. Medical Committee For Human Rights*, 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972), and

(2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation. See, e. g., *DeFunis v. Odegaard*, 412 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974); *Indiana Employment Security Div. v. Burney*, 409 U.S. 540, 93 S.Ct. 883 [, 35 L.Ed.2d 62] (1973). *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642, 649 (1979).

When both of these conditions have been satisfied, the case is moot because neither party has a legally cognizable interest in the final determination of the underlying facts and law.

■ Since this lawsuit was filed, the facts as stipulated by the parties indicate that HAKC has adopted a tenant assignment policy which provides for a minority preference and immediate housing option to encourage racial integration in housing projects with the greatest vacancy rate. All of the stipulations indicate to the Court that the tenant assignment policy in effect at the time this lawsuit was filed probably will not be readopted. Consequently, the Court finds that the first prong of the test established in *County of Los Angeles v. Davis* has been met. The action of HUD and HAKC in connection with the tenant assignment policies as originally challenged has been eliminated, and there is no indication that it will reoccur.

Plaintiffs maintain that the second prong of the *Davis* test has not been met because the affirmative action plan adopted will not remedy the racial impaction problems facing tenants at Riverview and other conventional housing projects. Defendants, however, claim that interim events have eradicated completely the effects of the tenant assignment policies which plaintiffs initially challenged. Plaintiffs admit that Riverview, once an almost all white project, has experienced significant changes in racial composition in the three years prior to the filing of this lawsuit. In their suggestions in support of the motion for preliminary injunction, plaintiffs suggest that this racial turnover can be expected to continue and that unless injunctive relief is granted plaintiffs will be "deprived of the racially balanced neighborhood in which they now live and create segregated pockets within an otherwise unsegregated environment." Plaintiffs thus admit that even prior to the adoption of the new tenant assignment policies, interim events had occurred which eliminated segregation at Riverview, the very injury to plaintiffs alleged to have resulted from the original discriminatory tenant assignment policies. Consequently, the claim that past discriminatory tenant assignment policies have created a segregated environment at Riverview has been rendered moot by the past actions of the defendants and by the accompanying changes in the racial composition of the Riverview project.

Plaintiffs' remaining claim can be reduced to a fear that the integrated environment will not be maintained and will become increasingly segregated. Defendants counter that, to the extent possible, the current racial percentages at Riverview will be maintained. There is no allegation in any suggestions submitted by plaintiffs that since the adoption of these new tenant assignment policies there has been increased racial turnover at Riverview. Given this factual background, the Court does not believe that plaintiffs' "fear" that a particular event might occur without judicial intervention is sufficient to establish injury in fact for the purposes of standing. There has been nothing submitted by plaintiffs since the filing of this lawsuit nor any suggestions or information from which the Court could infer or conclude that the integrated environment at Riverview is endangered by actions of the defendants in violation of their statutory and constitutional duties.

■ Even if such suggestions or allegations had been made in an effort to satisfy the requirement of injury in fact, the Court is not convinced that plaintiffs would be able to demonstrate or adequately allege a causal connection between this injury and the tenant assignment policies adopted in May of 1977. As the defendants note, the racial composition of all applicants seeking admission to and finding placement in the above seven family developments in the past has been as follows: 1975–85% non–white, 15% white; 1976–91% non–white, 9% white. The plaintiffs have recognized that the racial identity of applicants for conventional housing projects has an important bearing on both the racial composition of the housing project and the effectiveness of any tenant assignment policies containing affirmative action provisions in an effort to insure integration. Plaintiffs' proposed supplemented order determining findings of fact and conclusions of law as to plaintiffs' standing (August 31, 1979) suggests that "plaintiffs have shown by their residence in

a development subject to HAKC's Methods of Administration and threatened by minority racial concentration that they will be immediately and personally injured unless defendants adopt affirmative tenant assignment policies which assure an *integrated waiting list* for family developments." There is nothing to suggest to the Court that any method of assignment which defendants could adopt would have any significant effect on the racial identity of those individuals who apply for public housing. To the extent that any problems in maintaining an integrated environment at Riverview can be attributed to a lack of white applicants, the Court does not believe that plaintiffs have demonstrated a causal connection between the injury and the defendants' actions. As the Supreme Court in *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) pointed out, the case and controversy requirement of Article III still requires a federal court to address only those injuries traceable to the challenged action of the defendant and not injuries that result from the independent action of third parties not before the Court. As the Court noted in denying standing to low income persons seeking the invalidation of the town's restrictive zoning ordinance in *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343:

> [Petitioners] rely on little more than the remote possibility, unsubstantiated by allegations of fact, that their situation might have been better had respondents acted otherwise, and might improve were the court to afford relief. *Warth v. Seldin*, at 507, 95 S.Ct. at 2209, 45 L.Ed.2d at 360.

Unadorned speculation is not sufficient to invoke the federal judicial power. *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. at 44, 96 S.Ct. at 1927, 48 L.Ed.2d at 463–64. *Simon v. Eastern Ky. Welfare Rights Org., Linda R. S. v. Richard D.*, 410 U.S. at 614, 93 S.Ct. at 1146, 35 L.Ed.2d at 536, and *Warth v. Seldin*, 422 U.S. at 490, 95 S.Ct. at 2197, 45 L.Ed.2d at 343 all demonstrate the principle that while indirectness of injury may not necessarily be fatal to standing, it

may create substantial difficulties in meeting the minimum requirement of Article III; i. e., to establish that the asserted injury resulted in fact from the defendant's action or that prospective relief will remove the harm. For these reasons the Court finds that plaintiffs at this point have not met the standing requirements necessary for asserting a claim that defendants' assignment policies have created "tipping effects" which may destroy plaintiffs' integrated environment.

Plaintiffs also suggest that the claims concerning the defendants' tenant assignment policies are not moot since current tenant assignment policies have not remedied racial impaction problems at other conventional housing projects. While the Supreme Court in recent years has broadened the types or categories of injury which may be alleged in support of standing, the Court has never abandoned the requirement that a party seeking to invoke the Court's judicial authority must *himself* have suffered injury. *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. at 39, 96 S.Ct. at 1924, 48 L.Ed.2d at 461. No decision concerning the class certification issue has been made. Consequently the only parties before the Court in connection with the standing issue are the individual plaintiffs, all of whom reside or have resided at the Riverview project, and the Riverview Tenants Association. In a similar case involving four public housing applicants seeking declaratory and injunctive relief against HUD and HAKC, the United States District Court for the Western District of Missouri dismissed the case as moot after apartments were awarded to all four plaintiffs. Plaintiffs argued that the case was not moot as to other proposed class members. In upholding the district court's decision, the Eighth Circuit held:

> In light of the Supreme Court's recent decisions in *Board of School Comm'rs v. Jacobs*, 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975), and *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975), we hold that the district court did not err in dismissing this action as moot.

*Jacobs* and *Sosna* indicate that dismissal is required by the case or controversy provisions of Article III when the claims of all the named plaintiffs become moot before certification of the class under Fed.R.Civ.P. 23(c)(1). *Bradley v. Housing Authority of Kansas City, Mo.*, 512 F.2d 626, 628 (8th Cir. 1975).

Thus the potential claims by residents of other apartment complexes concerning segregation caused by past tenant assignment policies of HAKC and HUD which have not been rendered moot by subsequent events does not prevent dismissal of these plaintiffs' claims on grounds of mootness and lack of standing.

### Program Reservations

In addition to challenging the tenant assignment policies utilized in connection with applicants for conventional housing projects, plaintiffs' complaint also challenges certain administrative decisions made by HUD and the Housing Authority of Kansas City in connection with the conventional housing program. These decisions challenged include:

42. In January, 1973, HUD froze virtually all new housing starts for low income families under the programs authorized by the United States Housing Act and designed to encourage the *production* of new units for use by lower–income families.

43. HUD, instead of authorizing the construction of new conventional units as requested by the Housing Authority and other local housing authorities, administratively developed the so–called § 23 Revised leasing program under which HUD stated it intended to achieve national housing goals for low–and moderate–income families.

52. HUD has refused at all times since 1964, to permit the Housing Authority to execute plans for the construction of new conventional units designed for families, and under the Annual Contributions Contract has failed and refused to furnish the Authority adequate monies to properly maintain and improve the environment in and around the Authority's conventional developments or provide associated social and other services necessary to administer developments intended for use by persons of very low income. As a direct result of this policy of HUD, the Housing Authority has had continuous financial problems and has become "the houser of last resort" for the poorest and most disadvantaged citizens of Kansas City, who are forced to live in a continually less satisfactory environment because of inadequate maintenance, lack of social services, and associated deficiencies.

53. HUD has consistently failed to exercise its powers to authorize construction of new low–rent units outside the central city area, and has in fact arbitrarily refused to permit the Housing Authority to build standard units in outlying areas of Kansas City.

54. Under one Program Reservation alone, the Housing Authority was granted approval to construct 335 new family units on a geographically–dispersed basis. Because no low–income family units had been constructed in Kansas City, Missouri, in over 10 years, these units were deemed critical to help alleviate the shortage of decent, safe and sanitary housing for poor families. Construction of these units was also considered necessary to remedy the continuing racial impaction in the seven family developments described above and permit the dispersal of minority families throughout the metropolitan area.

55. Relying on this commitment from HUD, the Housing Authority reviewed over 25 site locations for construction. On or about June 5, 1973, 9 sites were approved by the City Council of Kansas City, Missouri and submitted to HUD for review and appraisal.

56. Thereafter, HUD intentionally frustrated and blocked the efforts of the Housing Authority to obtain federal approval for construction of any low–income units in non–segregated areas of the city. HUD officials took excessive periods of time to perform reviews, estab-

lished unrealistically low appraisals which prevented the purchase of land tracts, and placed unreasonable time limitations on the Housing Authority.

57. As a direct result of the actions of HUD, construction sites were not obtained and on August 9, 1974, HUD recaptured the last of the 335 units which had been reserved for the Housing Authority and declared that no new family apartments would be built.

58. The above actions were taken by HUD with full knowledge that low–income public housing for families was desparately needed in Kansas City, Missouri, and that the housing which existed was becoming racially segregated. HUD officials knew or should have known that construction of new family units was absolutely essential to the operation of a racially integrated public housing system by the Housing Authority and to attainment of the national goal of fair and open housing.

59. The arbitrary and discriminatory site selection process employed by HUD has confined public housing in Kansas City to a limited geographical area. This has directly resulted in racial impaction of public housing developments and has deprived low–income minority and white families of an opportunity to live in racially–integrated neighborhoods outside the Kansas City School District. HUD has taken no affirmative effort to ensure that public housing will be constructed throughout the metropolitan area.

60. The above acts and failures to act effectively eliminate the existence in Kansas City of decent public housing located in an integrated neighborhood, providing balanced living patterns in a satisfactory environment and will ultimately cause resegregation depriving low–income black individuals and families of housing opportunities Congress intended to effect through the United States Housing Act of 1937, as amended.

66. The various actions of HUD including its moratorium, reliance on existing housing, and refusal to approve construction of conventional units, all of which nullified attempts by the Housing Authority to construct or allocate low–rent units for low–income minorities in outlying regions of Metropolitan Kansas City were arbitrary and capricious, violated the duties of the Secretary to promote healthy, integrated neighborhoods in a manner affirmatively furthering the policies and purposes of the United States Housing Act and the Fair Housing Act of 1968, and deprived plaintiffs of rights granted them by the Fifth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1981 and 1982.

The Court believes that these portions of plaintiffs' complaint can be characterized as seeking review under § 706 of the Administrative Procedures Act of HUD's decision to recall program reservations for conventional units first issued in 1970, and the failure of the Housing Authority of Kansas City to effectively utilize the program reservations for conventional housing units prior to their recall.

The parties stipulated the following facts concerning the utilization of program reservations:

268. On September 17, 1968, HUD prepared a "Market Analysis for Kansas City, Missouri". A copy of that analysis is set forth as Exhibit 66.

269. HAKC received from HUD on December 3, 1970, a program reservation for 500 units of conventional public housing under Project No. MO2–D (4C–27).

270. A preliminary loan contract for $62,500 for Project No. MO2–D was executed between HUD and HAKC on October 22, 1968.

271. HAKC received from HUD on December 3, 1970, a program reservation for 250 units of conventional public housing under Project No. MO2–E.

272. A preliminary loan contract for $50,000 for Project No. MO2–E was executed between HUD and HAKC on January 6, 1971.

273. HAKC had the responsibility to submit an approvable application to HUD prior to HUD's actual monetary assistance in construction.

274. HUD would subsequently reserve the contract authority for and would agree to assist in funding the construction of 750 units of low-rent housing to be owned and managed by HAKC as authorized by the USHA.

275. Construction of three conventional projects for the elderly reduced the 750 unit program reservations to 460 units by 1971.

276. A partial timetable for implementing HAKC's development strategy stated above is set forth in Exhibit 67.

277. Documents relating to HAKC's invitation for turn-key proposals and its general development criteria pursuant to this development strategy are set forth in Exhibit 68.

278. HUD's area office approved "joint HAKC and City of Kansas City Development Strategy" as set forth in Exhibit 69.

279. HAKC had determined in late 1972 to construct, wherever possible, single family detached homes or townhouse apartments on a dispersed site basis.

280. HAKC decided upon the above type of construction in order to make its buildings comparable to those in the newer neighborhoods in which it planned to build and in order to avoid the concentration of families with similar social and economic characteristics.

281. Any project which HAKC proposed to construct for families would be limited to no more than 60 units.

282. The City of Kansas City, Missouri appropriated $25,000 to HAKC for use in acquiring options for the purchase of approved sites.

283. On January 5, 1973, the City Council of Kansas City, Missouri approved a resolution in connection with HAKC's development strategy. A copy of this resolution is set forth as Exhibit 70.

284. In late 1972, the HUD Area and Regional Offices had decided to recapture the 460 remaining units and allocate them to other regions of the country.

285. The decision of the Area Office was later revised so that HAKC maintained a program reservation for 355 units.

286. As a condition to return of the 460 units to HAKC, HUD required that the 125 Section 23 units be deducted from that total, thereby reducing the total number of units in the program reservations designated Project MO2-D and MO2-E to a total of 335 units.

287. On February 27, 1973, HUD issued directions to HAKC resulting from this "moratorium," as set forth in Exhibit 71.

288. On April 23, 1973, the HUD Area Office was informed verbally that permission had been granted to proceed with the development of the 460 units remaining in HAKC's program reservations, as set forth in Exhibit 72.

289. On May 3, 1973, HUD advised HAKC that permission had been granted to proceed with the development of program reservations MO2-D and MO2-E.

290. HAKC proposed to construct a development of 52 units for families at 99th and Whitton Road in 1970.

291. On March 13, 1970, HUD transmitted to HAKC a notice of rejection of this site. A copy of this notice is set forth as Exhibit 73.

292. By letter dated March 30, 1971, the proposed turnkey project at the above site was again rejected by HUD. A copy of that letter is set forth as Exhibit 74.

293. On June 6, 1973, HAKC submitted to HUD a list of nine proposed sites which had been approved by the City Council and requested HUD review of the sites by the week of June 11, 1973. A copy of this letter is set forth as Exhibit 75.

294. On July 30, 1973, HUD advised HAKC by letter of its determination on the sites. A copy of this letter is set forth as Exhibit 76.

295. HUD's "Preliminary Site Report" for the site at N.E. 40th and N. Cherry is set forth as Exhibit 77.

296. HUD's "Preliminary Site Report" for the site at N.E. 53rd and N. Lister is set forth as Exhibit 78.

297. HUD's "Preliminary Site Report" for the site at 108th and Marsh (East) is set forth as Exhibit 79.

298. HUD's "Preliminary Site Report" for the site at 108th and Marsh (West) is set forth as Exhibit 80.

299. HUD's "Preliminary Site Report" for the site at 133rd and Wornall is set forth as Exhibit 81.

300. HUD's "Preliminary Site Report" for the site at 69th and Corrington (I–435) is set forth as Exhibit 82.

301. HUD's "Preliminary Site Report" for the site at 99th and Cherry is set forth as Exhibit 83.

302. HUD's "Preliminary Site Report" for the site at 17th and Benton is set forth as Exhibit 84.

303. On July 31, 1973, HAKC requested that HUD perform appraisals of the two approved sites at 133rd and Wornall and 69th and Corrington. A copy of this letter is set forth as Exhibit 85.

304. On October 2, 1973, HUD transmitted to HAKC its appraisal of the site at 133rd and Wornall. A copy of this letter is set forth as Exhibit 86.

305. The owner of the land at 133rd and Wornall refused to sell the land to HAKC at the amount appraised by HUD.

306. The owner of this site was of the opinion that the market value of his land was higher than HUD's appraised value.

307. HAKC did not have adequate financing of its own to purchase the land at 133rd and Wornall.

308. Under applicable HUD regulations, HUD would not allow utilization of federal funds for the purchase of any land for a public housing development for a price in excess of the value at which HUD appraised the land.

309. Instructions for HUD appraisals for public housing projects are contained in HUD Handbook 7410.2, Chapter 6, Section 2. A copy of that handbook is set forth as Exhibit 87.

310. The following sites were located outside the Kansas City School District: 69th and Corrington; 133rd and Wornall; 108th and Marsh (East); 108th and Marsh (West); N.E. 53rd and N. Lister; and N.E. 40th and N. Cherry.

311. On January 11, 1974, HAKC submitted to HUD two additional sites located at N.E. 87th and N. Troost and 102nd and Hardesty. A copy of this submission is set forth as Exhibit 88.

312. Both of the above sites were located outside the Kansas City School District.

313. HUD prepared an "Evaluation of Application for Low–Rent Public Housing" with respect to the site at 102nd and Hardesty in February, 1974. A copy of this evaluation is set forth as Exhibit 89.

314. On February 27, 1974, HUD rejected the site at 102nd and Hardesty. A copy of this rejection is set forth as Exhibit 90.

315. On January 22, 1974, HUD officials prepared a memorandum with respect to the site at N.E. 87th and N. Troost. A copy of this memorandum is set forth as Exhibit 91.

316. In February, 1974, HUD prepared an "Evaluation of Proposal Application for Low Rent Public Housing" with respect to the site at N.E. 87th and N. Troost. A copy of this evaluation is set forth as Exhibit 92.

317. On February 27, 1974, HUD approved the site at N.E. 87th and N. Troost. A copy of this approval is set forth as Exhibit 93.

318. On April 22, 1974, HUD transmitted to HAKC its appraisal of the site at N.E. 87th and N. Troost. A copy of this appraisal is set forth as Exhibit 94.

319. The owner of the land at N.E. 87th and N. Troost refused to sell the land to HAKC at the amount appraised by HUD.

320. The owner of this site was of the opinion that the market value of his land was higher than the appraised value.

321. HAKC did not have adequate financing of its own to purchase the land at N.E. 87th and N. Troost.

322. HAKC submitted six turnkey type proposals for review on February 1, 1974. The proposed sites were (1) 69th and I–435 (Corrington); (2) 4305 East 10th, 4200 East 11th, 1100 South Norton, and 4500 East 9th (scattered sites); (3) 115th and Food Land; (4) 86th and North Oak; (5) 91st and Indiana; and (6) 81st and Park.

323. On May 28, 1974, HUD rejected all five new site proposals; a copy is set forth as Exhibit 95.

324. HUD's "Evaluation of Application for Low–Rent Public Housing" for the site at 91st and Indiana is set forth as Exhibit 96.

325. HUD's "Evaluation of Application for Low–Rent Public Housing" for the site at First and Park Avenue is set forth as Exhibit 97.

326. HUD's "Evaluation of Application for Low–Rent Public Housing" for the site at N.E. 86th and N. Oak is set forth as Exhibit 98.

327. HUD's "Evaluation of Application for Low–Rent Public Housing" for the site at 115 and Food Lane is set forth as Exhibit 99.

328. HUD's "Evaluation of Application for Low–Rent Public Housing" for four scattered sites is set forth as Exhibit 100.

329. The following sites are located outside the Kansas City School District: 91st and Indiana; 83rd and Park Avenue; N.E. 86th and N. Oak; and 115th and Food Lane.

330. On May 29, 1974, HUD notified HAKC that all its outstanding program reservations were recalled. A copy of this letter is set forth as Exhibit 101.

331. HAKC was told by HUD that if it could "utilize the reservations, first issued on December 3, 1970 for project MO2–E, and move rapidly to a construction start [it] should immediately notify [HUD], citing the justification for [its] conclusion and request for reconsideration" by June 7, 1974. A copy of the letter is set forth as Exhibit 101.

332. On June 27, 1974, a conference was held at the HUD Regional Office to discuss HUD's denial of HAKC's request for reconsideration. A copy of a report of said meeting is set forth as Exhibit 102.

333. On June 7, 1974, HAKC requested that HUD reconsider its rejection of the site at 115th and Food Lane. A copy of this letter request is set forth as Exhibit 103.

334. On June 21, 1974, HUD rejected this request for reconsideration. A copy of this letter is set forth as Exhibit 104.

335. On June 29, 1974, HUD's Area Office Director sent to HUD's Regional Office a memorandum discussing HUD's decision to deny HAKC's reconsideration request on the site at 115th and Food Lane. A copy of this memorandum is set forth as Exhibit 105.

336. HUD established certain prototype costs for dwelling units which were to be constructed with federal financial assistance.

337. The annual determinations of prototype costs by the Secretary are published at 36 F.R. 8213, May 1, 1971; 37 F.R. 9902, May 17, 1972; 38 F.R. 15041, June 8, 1973; 39 F.R. 17678, May 17, 1974; 40 F.R. 24818, June 10, 1975; and 41 F.R. 23302, June 9, 1976.

338. Defendant Bridges stated in a letter to HUD that the construction proposal at 115th and Food Lane could be brought within HUD's prototype costs, and that membership in the Kirktown Homes Association would allow HAKC to provide basic maintenance services to its tenants at reduced cost. A copy of this letter is set forth as Exhibit 106.

339. Other sites which were submitted by HAKC to HUD at various times between January 1, 1973, and August, 1974, but which were not approved by HUD, include the following: (a) 3400 Genessee, (b) 3600 Genessee, (c) 56th and Bennington, (d) 90th and Troost, (e) 36th and Brighton, (f) 86th and Brooklyn, (g) Robin Hood Lane and N.W. Waukomis, (h) 72nd and North Broadway, (i) 74th and North Broadway, (j) Parvin Road and Bellaire, (k) Northwest 64th and Brown Ridge Drive, (1) 31st and Ashland.

340. The bases for the HUD rejections of these sites are set forth in Exhibit 107.

341. HUD prepared an "Evaluation of Application for Low–Rent Public Housing" with respect to the site at 69th and Corrington in April, 1974. A copy of this evaluation is set forth as Exhibit 108.

342. On May 8, 1974, HUD's Area Office chief underwriter issued a report approving the site at 69th and Corrington. A copy of this report is set forth as Exhibit 109.

343. With the exception of the sites at 69th and Corrington and 115th and Food Lane, HAKC was unable to utilize federal funds for the purchase of HUD–approved sites because the HUD–appraised values were lower than owners of those properties would accept.

344. HUD's Area Office had appraised the site at 69th and Corrington at $30,360. HAKC objected to this appraisal and requested a reappraisal by the Regional Office, which resulted in an evaluation for the site at 69th and Corrington of $36,000.

345. The proposed turnkey developer/owner of the site at 69th and Corrington agreed to the appraised value of $36,000, as set forth in Exhibit 110.

346. On July 9, 1974, HUD's Regional Administrator directed HAKC to show conclusively within two weeks that construction on the site at 69th and Corrington could proceed within 90 days. A copy of this letter is set forth as Exhibit 111.

347. On July 30, 1974, HUD's Area Counsel submitted to HUD's Area Director a memorandum concerning restrictions on the site at 69th and Corrington. A copy of this memorandum is set forth as Exhibit 112.

348. On August 2, 1974, HAKC advised HUD that construction would commence on the 69th and Corrington site by October 31, 1974. A copy of this letter is set forth as Exhibit 113.

349. On August 5, 1974, a meeting was held in the HUD Area Office between HUD employees and residents in the neighborhood of the 69th and Corrington site. A copy of a memorandum describing that meeting is set forth as Exhibit 114.

350. By letter dated August 9, 1974, HUD cancelled all HAKC remaining program reservations and terminated all assistance for construction on the 69th and Corrington site. A copy of this letter is set forth as Exhibit 115.

351. HUD's Preliminary Loan Contract and HUD Circular HPMC–FHA 7402.7 (August 14, 1972) "Instructions for Suspending Advances or Activity, Reducing the Number of Units and Canceling Program Reservations or Terminating Preliminary Loan Contracts or Annual Contributions Contracts" is set forth as Exhibit 116.

352. On June 7, 1974, HAKC requested that its remaining 228 units in program reservation MO2–E be converted to the Section 23 Program rather than be recalled. A copy of this letter request is set forth as Exhibit 117.

353. On June 7, 1974, the City Council of Kansas City, Missouri, passed a resolution approving HAKC's application for Section 23 units. A copy of this resolution is set forth as Exhibit 118.

354. HAKC was not offered additional reservations for the construction of new conventional low–rent public housing units by HUD between December 3, 1970 and the present date.

355. Between January 1, 1973, and August 9, 1974, the Program Manager in the Area Office of HUD coordinated reviews of proposals for the construction of low–rent public housing.

356. During the above period, the Program Manager at HUD's Area Office was Lester Marriner.

357. In April of 1973, the Model Cities Department of Kansas City, Missouri, which was funded by HUD, issued a report on housing needs in Kansas City, Missouri, which report had been prepared by SPA/REDCO, Inc., a Chicago based consulting firm (SPA/REDCO report). A copy of this report is set forth as Exhibit 119.

358. HAKC had on its staff between January 1, 1973, and August 9, 1974, Ralph

Keys, Development Director, and John Shoch, Development Specialist. These two individuals were responsible for HAKC's new construction program.

359. All proposed construction sites were reviewed and approved by the above named two individuals on HAKC's staff and by the City Development Department of Kansas City, Missouri, before they were submitted to HUD.

The proposed orders submitted by the parties on the preliminary issues concentrate on resolution of the standing issue in connection with plaintiffs' claims concerning the Section 8 rental program and discriminatory tenant assignment policies. However, the Court perceives a significant standing issue with regard to plaintiffs' allegations concerning the program reservations offered to the housing authority in 1970 which were subsequently withdrawn.

As the Court has already pointed out, a party seeking to invoke the jurisdiction of the Court must allege injury in fact sufficient to warrant his invocation of the Court's jurisdiction. In order to demonstrate that these plaintiffs have suffered some injury from the failure of the Housing Authority to utilize the allocated program reservations, plaintiffs allege a desire to live in public housing developments constructed by the Housing Authority on a scattered site basis outside the Kansas City School District. Plaintiffs assume that these 1970 program reservations would have been used to build scattered site housing in the areas in which they desire to live, and that they would have been eligible to apply for a transfer to these projects. Other courts have allowed residents of public housing projects or others who would be eligible for housing in a planned housing project to challenge the actions of HUD and local housing authorities taken in connection with proposed projects. *Blackshear Residents Organization v. Housing Authority of City of Austin*, 347 F.Supp. 1138 (W.D. Tx.1972); *Crow v. Brown*, 332 F.Supp. 382 (N.D.Ga.1971), affirmed 457 F.2d 788 (5th Cir. 1972); *Park View Heights Corporation v. City of Black Jack*, 467 F.2d 1208 (8th

Cir. 1972). Thus for the purpose of considering the defendants' motion to dismiss for lack of standing in connection with this claim, the Court is willing to assume that plaintiffs, as potential residents of the scattered site housing proposed to be built from the 1970 program reservations, have demonstrated injury in fact from the failure of HUD and housing authority to carry out their proposed plans.

Having determined that plaintiffs have alleged injury in fact, the Court must determine whether a causal connection exists between the claimed injury and the challenged conduct which will enable the Court, through the exercise of its remedial powers, to redress the claimed injury. Plaintiffs request the Court to:

(d) order defendant HUD to immediately assign program reservations and advertise the availability of contract authority under the Housing Act of 1937, 42 U.S.C. § 1437, *et seq.*, to assist with the construction of conventional and Section 8 family units on behalf of plaintiffs and members of the class in well–planned neighborhoods outside the Kansas City School District, within the Kansas City Standard Metropolitan Statistical Area, sufficient in number to provide opportunities for plaintiffs and members of the class to reside in well–planned neighborhoods which are not impacted by low–income minorities [plaintiffs' complaint at p. 17].

While a consideration of the standing issue normally does not permit the Court to pass on the merits of plaintiffs' case, the Court believes this factor must be considered when the Court is plainly not empowered under any circumstances to grant the relief plaintiffs seek. The second portion of the standing test requires the Court to determine whether, through exercise of its remedial power, the Court may redress the claimed injury. In *Duke Power Co. v. Carolina Env. Study Group*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) the Supreme Court indicated:

The more difficult step in the standing inquiry is establishing that these injuries

"fairly can be traced to the challenged action of the defendant,", or put otherwise, that the exercise of the Court's remedial powers would redress the claimed injuries. [citations omitted] *Duke Power Co. v. Carolina Env. Study Group*, at 74, 98 S.Ct. at 2631, 57 L.Ed.2d at 612. The Ninth Circuit has capsulized the standing requirements outlined in recent Supreme Court decisions into the following three–part test:

> The test for standing . . . is that the plaintiffs must have alleged (a) a particularized injury (b) concretely and demonstrably resulting from defendants' action (c) which injury will be redressed by the remedy sought. *Boating Industry Associations v. Marshall*, 601 F.2d 1376, 1380 (9th Cir. 1979).

■ Development of conventional public housing projects is carried out in accordance with regulations established by HUD. These regulations require an entity seeking eligibility to participate in the conventional housing program to demonstrate compliance with the regulation's definition of a public housing agency (PHA) and the required legal authority to perform the functions of a PHA under this part. 24 C.F.R. 841.102(a). To apply for a program reservation a public housing authority is required to submit an application identifying the number and types of units, the site or location (to the extent that it has been determined), its relationship to the housing assistance plan and site requirements along with other information concerning the proposed project. 24 C.F.R. 841.110(b). The application may include an application for a preliminary loan for money to help finance this developmental stage. A number of requirements exist for field office review and approval of such applications. See 24 C.F.R. § 841.111. After approving the application, the field office issues program reservations to the public housing authorities whose application is approved. As part of the program reservation a time limit not to exceed one year is established during which the public housing authority must submit and obtain approval for a develop-

ment plan. The field office is directed pursuant to these regulations to cancel program reservations if this time limit is exceeded unless the field office determines for good cause to issue an extension. 24 C.F.R. § 841.111(b). This regulation also specifies the materials which must be submitted to HUD as part of the developmental program. 24 C.F.R. § 841.115. The annual contribution contract is defined as the contract for loans and annual contributions under which HUD finances the development and provides for financial assistance for operation of a project under the Act. This contract is based on the development program, 24 C.F.R. § 841.102(a) and 841.116, and is not executed until the public housing authority has adopted and HUD has approved the development program. A program reservation is defined as:

> A written notification by HUD to the PHA, which is not a legal obligation, expressing HUD's determination, subject to fulfillment by the PHA of all legal and administrative requirements within a stated time, to enter into a new or amended Preliminary Loan Contract or ACC covering the stated number of housing units, or such lesser number as is consistent with the amount of contract and budget authority reserved by HUD with respect to the Program Reservation. 24 C.F.R. § 841.102(h).

The public housing authority is not authorized to enter into any construction contracts, preliminary contract of sale, contract of sale, contract for rehabilitation work, contract to acquire property or any other type of contract until after execution of the annual contribution contract. In the instant case, the development plan for the program reservations allocated in 1970 was never approved because of difficulties in obtaining site selection approval. Therefore no annual contribution contract was ever entered into, and no money was ever appropriated or committed to this project. In effect plaintiffs' request that this Court order HUD to make program reservations and in addition advertise the availability of contract authority to construct conventional units, amounts to a request that HUD and

the executive branch be ordered to appropriate and authorize funds for utilization in connection with the development of scattered site housing projects in Kansas City. In the *National Ass'n of Regional Councils v. Costle*, 564 F.2d 583 (D.C. Cir. 1977), an action was brought for declaratory judgment concerning the unobligated balance of contract authority of the E.P.A. The Court of Appeals for the District of Columbia made the following analysis of the manner in which appropriations and contract authorizations are made:

> Government agencies may only enter into obligations to pay money if they have been granted such authority by Congress. Amounts so authorized by Congress are termed collectively "budget authority" and can be subdivided into three conceptually distinct categories—appropriations, contract authority, and borrowing authority. Appropriations permit an agency to incur obligations and to make payments on obligations. Contract authority is legislative authorization for an agency to create obligations in advance of an appropriation. It requires a subsequent appropriation or some other source of funds before the obligation incurred may actually be liquidated by the outlay of monies. Borrowing authority permits an agency to spend debt receipts. *National Ass'n of Regional Councils v. Costle*, 564 F.2d at 586.

Granting the contract authority for the development of the housing units desired by plaintiffs would in effect be an authorization for the Housing Authority to incur obligations in connection with the location and construction of these units which Congress would ultimately be required to fund through an appropriation. Article I, Section 9 Clause 7 of the United States Constitution provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law;". Accordingly, the Court in *Costle* found:

> Decisions that a court may act to prevent the expiration of budget authority which has not terminated at the time suit is filed are completely consistent with the accepted principle that the equity powers

of the courts allow them to take action to preserve the status quo of a dispute and to protect their ability to decide a case properly before them. In such situations, the courts simply suspend the operation of a lapse provision and extend the term of already existing budget authority. If, however, budget authority has lapsed before suit is brought, there is no underlying congressional authorization for the court to preserve. It has vanished, and any order of the court to obligate public money conflicts with the constitutional provision vesting sole power to make such authorizations in the Congress. Equity empowers the courts to prevent the termination of budget authority which exists, *but if it does not exist, either because it was never provided or because it has terminated, the Constitution prohibits the courts from creating it no matter how compelling the equities.* *National Ass'n of Regional Councils v. Costle*, 564 F.2d at 588–89 (emphasis added).

The Court believes that it is prevented by these constitutional principles from issuing any order allowing the Housing Authority of Kansas City to enter into contracts for the construction of public housing projects for which no annual contribution contract has been entered and no appropriation made.

Additionally courts have held that relief sought by plaintiffs which in effect would compel federal defendants to award funds to a particular plaintiff is a request for a mandatory injunction. When a mandatory injunction against a government official is sought, all of the common law restrictions on mandamus apply. *Sodus Central School Dist. v. Kreps*, 468 F.Supp. 884, 885 (W.D.N.Y.1978). Thus the Court in *Sodus* held:

> The relief sought by the plaintiff to compel the defendants to award funds to the plaintiff is clearly a request for a mandatory injunction. Because the mandatory injunction is sought against a government official, it is a suit in the nature of mandamus and all of the common law restrictions on the use of mandamus is

applicable. *Panama Canal Co. v. Grace Lines, Inc.,* 356 U.S. 309, 78 S.Ct. 752, 2 L.Ed.2d 788 (1958). The fundamental restriction on the use of mandamus is that the remedy is available only to compel performance of a plainly ministerial duty or to compel an exercise of discretion where the applicable statute requires an exercise of discretion. Mandamus is not available to compel the exercise of discretion in a particular manner. *Panama Canal Co. v. Grace Lines Co.,* 356 U.S. 309, 78 S.Ct. 752, 2 L.Ed.2d 788.

The ministerial discretionary test is applied in suits brought by potential recipients of federal grants and contracts to compel allocation of funds to a particular applicant or in a particular manner. *Davis Associates, Inc. v. Sec. of HUD,* 498 F.2d 385 (1 Cir. 1974); *McCarey v. McNamara,* 390 F.2d 601 (3 Cir. 1968).

The LPW Act clearly contemplates the exercise of broad administrative discretion in funding projects. The LPW Act does not require that the defendants make any grants to any eligible applicant, including the plaintiff. The language of Sections 103, 104 and 105 of the LPW Act authorizes the Secretary of Commerce to make grants. Such language is not mandatory nor peremptory. No provision of the LPW Act requires or mandates that any of the defendants obligate all monies appropriated for the LPW Act for specified grant projects. *Sodus Central School Dist. v. Kreps,* 468 F.Supp. at 885–86.

Like the act at issue in *Sodus Central School Dist.,* the National Housing Act, 42 U.S.C. § 1437, clearly contemplates broad administrative discretion in the determination of which projects should be funded. 42 U.S.C. § 1437b limits the amount of loans the Secretary may have outstanding at any time and § 1437c places a limit on the aggregate amount of the annual contribution contracts which the Secretary may authorize. The Act authorizes the Secretary to finance conventional public housing projects, but the language is not mandatory and does not require that the defendant finance every public housing authority which applies for financial assistance in building a conventional public housing project. Thus, for the reasons cited above the Court does not believe that plaintiffs are entitled to the relief sought in connection with this claim. The Court notes that while a number of cases cited by the plaintiffs involved regulation by the courts of sites used for the construction of conventional public housing projects or judicial review of other phases of conventional public housing construction programs, in all such cases funds either had been appropriated by Congress and authorized by the administrative agency involved for the project in question prior to the filing of the lawsuit or the suit was brought in the context of an ongoing building project. See, for example, *Blackshear Res. Org. v. Housing Auth. of City of Austin,* 347 F.Supp. at 1138; and *Res. Advisory Bd. v. Rizzo,* 564 F.2d 126 (3d Cir. 1977).

Thus the defendants' motion to dismiss for want of standing will be granted in connection with plaintiffs' claims concerning the withdrawal of program reservations and failure to build conventional public housing projects.

The plaintiffs' complaint merely listed the statutes relied on and set forth a statement of facts (paragraphs 26–71) containing numerous allegations concerning the operation of the housing program in Kansas City. The Court has attempted to deal with all of the allegations in one of the three program categories discussed above.

For the reasons outlined above, the Court finds that the defendants' motion to dismiss plaintiffs' complaint in its entirety for want of standing must be granted. Therefore, it is hereby

ORDERED that the defendants' motion to dismiss for lack of standing is granted.